J-S42019-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SHANE FLEXER | : | |
| | : | |
| Appellant | : | No. 7 EDA 2020 |

Appeal from the Judgment of Sentence Entered October 3, 2019
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s): CP-39-CR-0001533-2019

BEFORE: PANELLA, P.J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY OLSON, J.:                    **FILED JANUARY 14, 2021**

Appellant, Shane Flexer, appeals from the judgment of sentence entered

on October 3, 2019 in the Criminal Division of the Court of Common Pleas of

Lehigh County, as made final by the denial of post-sentence motions on

November 25, 2019. We affirm.

The trial court aptly summarized the facts and procedural history in this

case as follows.

> [P.C.], the victim, was friends with [Appellant] for several years
> and invited him to live in her basement while she attempted to
> take care of him in 2012. [P.C.] was a wood carver by trade and
> helped teach [Appellant] some of the craft. At some point they
> shared an intimate romantic relationship. However, [P.C.] began
> to feel uncomfortable with the relationship, believed that
> [Appellant] was becoming increasingly abusive, and she
> attempted to dislodge him in 2015. For several months prior to
> [Appellant's] departure, [P.C.] had told [Appellant] that the
> relationship was over. [Appellant] remained in the home as he
> attempted to get back on his feet. [P.C.] moved on and began a
> new relationship.

Around September of 2015, [Appellant] finally left the house after [P.C.'s] brother convinced [Appellant] that he had to leave. [Appellant] moved to a nearby boarding house in [P.C.'s] neighborhood and walked by her home frequently. Although [P.C.] expressed a desire for no further contact, she was not free of [Appellant] until he moved to Georgia around 2017. [P.C.] expressed a desire for no contact directly with [Appellant] many times. Nevertheless, [Appellant] continued in his attempts to contact [P.C.]. At this point, [P.C.] ignored [Appellant's] attempts at contact by not responding.

In December of 2018, [Appellant's] attempts to contact [P.C.] escalated. [P.C.] received [electronic mail messages], repeated [tele]phone calls, and a letter from [Appellant]. [P.C.] wrote "rejected" on the letter and sent it back to [Appellant]. [Appellant] resent the letter and, in essence, informed [P.C.] that he refused to be rejected. [Appellant] called [P.C.] over 80 times in the month of December [2018]. [P.C.] responded by going to the police. A January 3, 2019 report verifies that law enforcement was notified and [Appellant] was put on notice he should stop contacting [P.C.].

Nevertheless, [Appellant] continued his messages from December of 2018 through March of 2019. [P.C.] did not respond, other than to reject the messages, until she answered a [telephone] call and specifically informed [Appellant] to "stop calling." [P.C.] cut off further communication to her house by having her service provider block further calls, and personally blocked [Appellant] on her [cellular telephone]. [Appellant] was not arrested at the time and remained in Georgia. [Appellant] continued contact regardless, and [P.C.] received voicemails, videos, and [electronic mail messages] in January and February [of 2019]. Between December of [2018] and April of 2019, [Appellant] called the victim over 250 times. In addition to the hundreds of [telephone] calls between December and April, [Appellant] sent the victim multiple [electronic mail messages]. In a QuickTime video attached to [electronic messages], sent approximately three times on January 26, 2019, [Appellant] repeatedly says "I like you."

In early March of 2019, [Appellant] attempted in-person contact. [P.C] was attending a craft show and set up as a vendor for three days in Richmond, Virginia. [Appellant] left his home in Georgia to track his victim down. On the second day, after the show[,]

the victim walked to her car and was confronted by [Appellant]. [P.C.] screamed at [Appellant] and told him to leave her alone and stay away. [P.C.] asked a passing man for help, was able to get in her car, and left. Again, the incident was reported to the police. She obtained a temporary Protect[ion] from Abuse Order ["PFA"] before she left Virginia.

On April 3, 2019, [Appellant], again, left his residence in Georgia and drove approximately 14 hours to surprise [P.C.] at her residence [in] Upper Milford Township, Lehigh County, Pennsylvania. [P.C.] found [Appellant] waiting outside her front door. [P.C.] became scared, locked the door, and called [the] police. [P.C.] testified that she hid in the basement, grabbed a nearby can of bug spray, and stayed on the [tele]phone until the [s]tate [t]roopers arrived.

Pennsylvania State Trooper Mirzet Sadikovic was the first responder and was joined shortly by Trooper Jackson.[1] Trooper Sadikovic instructed [Appellant] that [P.C.] wanted him to leave. [Appellant] insisted that he hear it from [P.C.] and relayed that once he did he would leave. When [P.C.] came out, in the presence of the [t]roopers, [Appellant] began asking [P.C.] strange questions to the effect of "do you know I like you, do you like me, do you know how much I like you." In response, [P.C.] told [Appellant] she did not like him anymore and to leave her alone.

After witnessing the interaction between [Appellant] and [P.C.], Trooper Sadikovic grasped the seriousness of the situation. Trooper Sadikovic told [Appellant] to leave immediately and escorted [P.C.] to obtain a [PFA]. Trooper Sadikovic instructed [P.C.] to follow him to the on-call Magisterial District Judge. Trooper Jackson stayed on scene in case [Appellant] came back or tried to enter the home. On the way to the [MDJ's] office, Trooper Sadikovic noticed [Appellant's] van parked by the side of the road. [Appellant] left his parked position and began to follow [P.C.'s] vehicle. In response, Trooper Sadikovic pulled over into a church parking lot in case there was some type of bizarre coincidence. However, [Appellant] continued to follow [P.C.] into the empty parking lot. Trooper Sadikovic quickly motioned for

---

[1] Trooper Jackson's first name does not appear in the transcript of Appellant's trial.

[P.C.] to leave so that he [could] position his cruiser safely behind her. When [P.C.] left the lot, [Appellant] continued to follow them.

Trooper Sadikovic radioed for backup and Trooper Jackson and Trooper David Angstadt responded. [The t]roopers created a blockade at a stoplight at Chestnut and Buckeye Road and detained [Appellant]. A dashcam video of Trooper Jackson's motor vehicle recording (MVR) of the incident was played for the [trial court]. When [Appellant] was asked why he was following the victim after he was told to leave and threatened with arrest, he responded that he knew he shouldn't [persist] but he was following his heart[.]

Trial Court Opinion, 11/25/19, at 3-6 (original footnotes and record citations omitted).

Based on the foregoing facts, Appellant was charged on May 28, 2019 with a misdemeanor offense of stalking (18 Pa.C.S.A. § 2709.1(A)(1)) and a summary offense of harassment (18 Pa.C.S.A. § 2709(A)(3)). After a record colloquy, Appellant elected to proceed *pro se* and the court appointed standby counsel. After an extension, the court convened trial on October 3, 2019 and found Appellant guilty of both charges. That same day, the court sentenced Appellant to 18 to 36 months' imprisonment followed by two years of probation. The trial court appointed counsel for purposes of post-trial litigation and appeal. On October 11, 2019, Appellant filed a timely post-sentence motion challenging the sufficiency and weight of the evidence offered in support of his stalking conviction. By order and opinion, the court denied Appellant's motion on November 25, 2019.

Appellant filed a notice of appeal on December 17, 2019. Thereafter, Appellant, on January 27, 2020, filed a Pa.R.A.P. 1925(b) concise statement

of errors complained of on appeal pursuant to order of court. On January 28, 2020, the court issued an order adopting its November 25, 2019 opinion as its Rule 1925(a) statement of reasons in support of the judgment challenged on appeal.

Appellant raises the following issues for our review.

Whether the evidence was sufficient to sustain [Appellant's] conviction[] for stalking if [Appellant] failed to have the specific intent required by the statute?

Was the verdict against the weight of all the evidence in regards to the proof of whether or not [Appellant] was properly proven to have the necessary criminal intent to commit the crime of stalking?

Appellant's Brief at 9.

In his first issue, Appellant asserts that the Commonwealth introduced insufficient evidence to prove that he possessed the necessary specific intent to establish the offense of stalking. While conceding that his actions may have been excessive or even inappropriate, Appellant maintains that the Commonwealth failed to show, beyond a reasonable doubt, that he acted with the intent to place P.C. in reasonable fear of bodily injury or intended to cause her substantial emotional distress. At best, Appellant claims that the evidence simply showed that he attempted to rekindle a romantic relationship with the victim or reach a satisfactory conclusion of their relationship.

Our standard of review regarding the sufficiency of the evidence is as follows:

The standard we apply in reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact[-]finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth may not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Lambert*, 795 A.2d 1010, 1014–1015 (Pa. Super. 2002)

(citations omitted).

The trial court reasoned as follows in rejecting Appellant's challenge to the sufficiency of the evidence.

A person commits the crime of stalking when the person engages in a course of conduct or repeatedly commits acts toward another person, including following the person without proper authority, under circumstances which demonstrate either an intent to place such other person in reasonable fear of bodily injury or to cause substantial emotional distress to such other person. 18 Pa.C.S.A. § 2709.1(A)(1). A person acts intentionally with respect to a material element of an offense when it is his conscious object to engage in conduct of that nature or to cause such a result. 18 Pa.C.S.A. § 302(b)(1).

[Appellant] contends that he never intended a specific result of either reasonable fear of bodily injury or substantial emotional distress. There is no dispute that [Appellant] engaged in a course of conduct and repeatedly committed acts towards the victim. The

- 6 -

issue is whether the circumstances demonstrate an intent to cause the victim fear of bodily injury or substantial emotional distress. It is longstanding in this Commonwealth that "because a state of mind by its very nature is subjective, absent a declaration by the actor himself we can only look to the conduct and the circumstances surrounding it to determine [the] mental state which occasioned it." **Commonwealth v. O'Searo**, 352 A.2d 30 (Pa. 1976).

The Commonwealth's evidence showed that the victim ended her relationship with [Appellant] and [Appellant] refused, and continued to refuse, to accept this fact. It seems clear to the [court, as factfinder,] that [Appellant] was on notice that his conduct was causing the victim substantial emotional distress but he chose to ignore the victim's words and actions. The victim wanted no contact with [Appellant]. [Appellant] did not take "no" for an answer and was told directly by the victim to leave her alone.

[Appellant] disregarded all reasonable requests for no contact and escalated his conduct by following the victim. [Appellant] traveled across state lines to surprise and harass the victim. In one incident, the victim screamed for help at the sight of [Appellant]. These circumstances would place any reasonable person in fear or cause them substantial emotional distress. Moreover, [the court] find[s] it particularly concerning that [Appellant] ignored specific police instruction to leave the scene and continued to follow both the victim and police to "follow his heart" [despite] the threat of arrest. The victim testified that she was scared and [Appellant] concede[d] he was aware of this fact. Therefore [the court finds] that the Commonwealth presented sufficient evidence of stalking.

Trial Court Opinion, 11/25/19, at 8-9.

We concur fully in the trial court's assessment of Appellant's sufficiency challenge. In essence, Appellant claims that the evidence of stalking must be insufficient because a lawful motivation could explain the actions proved at trial. Our standard of review is clear, however, that the facts and circumstances shown by the Commonwealth need not exclude every

possibility of innocence. For this reason, we agree that sufficient evidence supports Appellant's stalking conviction and that he is not entitled to relief on his first claim.

Appellant's second claim asserts that, even if sufficient evidence supported his stalking conviction, the verdict was nonetheless against the weight of the evidence. Specifically, Appellant maintains that "a fair reading of all of the testimony supports a finding that [Appellant] was acting in a mistaken attempt to either rekindle a romance or to otherwise settle his relationship with the victim in a manner that would provide both parties with a proper piece of mind." Appellant's Brief at 12.

Our standard and scope of review over a claim alleging that the verdict is contrary to the weight of the evidence is as follows.

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. It has often been stated that a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:
>
> > Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the

trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, [our Supreme Court has] explained:

The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Clay*, 64 A.3d 1049, 1054-1055 (Pa. 2013) (internal citations and quotations omitted).

After careful review and consideration of the certified record, the submissions of the parties, and the trial court's opinion, we are satisfied that the court did not abuse its discretion in rejecting Appellant's claim that his stalking conviction was against the weight of the evidence. Because the verdict does not shock the judicial conscious, we conclude that Appellant's weight claim is meritless.

J-S42019-20

Judgment of sentence affirmed.


*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 1/14/2021*

- 10 -